DOC #_____

AUSAs: Micah Fergenson, Kevin Mead

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**24 MAG 1517**

UNITED STATES OF AMERICA

v.

YOHANAN ELIGOOLA,

Defendant.

**COMPLAINT**

Violation of 18 U.S.C. § 1956(h)

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

LARISSA MONTES, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (Money Laundering Conspiracy)

1. From at least in or about June 2022 up to and including in or about April 2024, in the Southern District of New York and elsewhere, YOHANAN ELIGOOLA, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

2. It was a part and an object of the conspiracy that YOHANAN ELIGOOLA, the defendant, and others known and unknown, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United States Code, Section 841, would and did conduct and attempt to conduct a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, involving property represented to be the proceeds of specified unlawful activity, to wit, the proceeds of narcotics trafficking, in violation of Title 21, United States Code, Section 841, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Section 1956(h).)

### Summary

3. YOHANAN ELIGOOLA, the defendant, arranged to launder money for an individual he understood to be working on behalf of drug cartels in South America, who was, in truth and in fact, an undercover agent with the FBI ("UC-1"). Specifically, UC-1 gave ELIGOOLA large amounts of cash, and ELIGOOLA transferred the funds back to UC-1 via cryptocurrency and bank wires. ELIGOOLA specifically asked UC-1 if the money constituted

drug proceeds, and UC-1 said yes. ELIGOOLA laundered over half a million dollars represented by UC-1 to be narcotics proceeds.

4.      In addition to laundering what he understood to be drug money, YOHANAN ELIGOOLA, the defendant, agreed to sell UC-1 a number of military-grade munitions. Those included rifles, grenades, "kamikaze drones," rocket-propelled grenades, anti-tank weapons, and surface-to-air missiles. YOHANAN ELIGOOLA even provided UC-1 with a spreadsheet cataloging his available inventory and prices.

### YOHANAN ELIGOOLA's Initial Conversations with FBI Undercover Officers

5.      In or about June 2022, UC-1 began communicating with YOHANAN ELIGOOLA, the defendant, by phone.[1] UC-1 and ELIGOOLA discussed UC-1 transferring money to ELIGOOLA.

6.      On or about January 17, 2023, YOHANAN ELIGOOLA, the defendant, and UC-1 met in person. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

   a.   ELIGOOLA discussed how he could receive any amount of cash and could transfer it back to UC-1 within five days.

   b.   ELIGOOLA said that if he received cash from UC-1 in New York and transferred it back to a New York bank account, he would charge a rate of 10 to 12 percent.

   c.   ELIGOOLA said that an individual working for him would pick up the cash from UC-1.

   d.   ELIGOOLA said that UC-1 should tell him what ELIGOOLA should tell his bank about why he was wiring the money to UC-1.

   e.   ELIGOOLA said another individual would pick up the cash from UC-1.

   f.   ELIGOOLA asked if the cash that UC-1 planned to give him was "from drugs." UC-1 said yes, that the money was from drugs, and that he was "dealing with Colombians."

   g.   ELIGOOLA told UC-1 he would charge a lower fee if UC-1 would accept cryptocurrency in exchange for his cash.

   h.   ELIGOOLA told UC-1 that they should use encrypted messaging applications to discuss their transactions.

---

[1] The communications involving FBI undercover agents were recorded, and I know about those communications from reviewing the recordings and reports summarizing the recordings.

i. ELIGOOLA told UC-1 that when UC-1 received the wires from ELIGOOLA, "the bank will never ask you a question."

7. On or about February 14, 2023, YOHANAN ELIGOOLA, the defendant, and UC-1 met in person in New York, New York. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

a. ELIGOOLA told UC-1 that he could launder up to $1 million in cash per day if ELIGOOLA could transfer the money back to UC-1 in the form of cryptocurrency.

b. ELIGOOLA told UC-1 that he owned a factory that manufactured rifles, that he manufactured .50-caliber firearms and "suicide drones," and that "I control 35% of the [country name omitted] defense industry."

c. ELIGOOLA showed UC-1 pictures of M4 rifles and told UC-1 that he could give UC-1's contacts in South America a good price on M4 rifles.

d. UC-1 offered to hand ELIGOOLA $28,000 in cash at the meeting, in order for ELIGOOLA to launder that cash, but ELIGOOLA told UC-1 that the amount of money was too small, and he would not accept less than $50,000 in cash at a time.

e. UC-1 and ELIGOOLA discussed that UC-1 would shortly transfer cash to ELIGOOLA, and that ELIGOOLA would return the money to him in the form of cryptocurrency and a bank wire.

f. ELIGOOLA and UC-1 discussed what they would tell the bank about the wire transfers. In that context, ELIGOOLA told UC-1 to tell him what UC-1's company was doing. I understand from my training and experience and my involvement in this investigation that ELIGOOLA asked this question in order to effectively deceive the bank when he made a money laundering transfer to UC-1's company.

### The First Money-Laundering Transaction of $60,000

8. On or about March 22, 2023, a coconspirator not named herein ("CC-1") met with UC-1. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

a. UC-1 and CC-1 met at a restaurant. Shortly after meeting UC-1, CC-1 had a short video call with YOHANAN ELIGOOLA, the defendant.

b. After the call, UC-1 confirmed that CC-1 was "familiar with everything." UC-1 explained that he had "60" on him—*i.e.*, $60,000 in cash—which was part of an "initial test" to see "how fast" ELIGOOLA would return the laundered funds.

   c.   UC-1 requested that, in addition to cryptocurrency, part of the laundered funds be returned via a bank wire. UC-1 stated that his "friend in South America" was also interested in bank wires. CC-1 replied that this arrangement should not be a problem.

   d.   UC-1 said he would also discuss the arrangement with ELIGOOLA, but did not like talking about such things over the phone. CC-1 stated he would tell ELIGOOLA what UC-1 told him. UC-1 said he would also send ELIGOOLA a note.

   e.   UC-1 then handed CC-1 a bag containing approximately $60,000 in cash. After receiving the bag, CC-1 left for approximately ten minutes to count the cash. CC-1 then returned and confirmed to UC-1 that it was all there.

   9.   Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days after the March 22, 2023 meeting between UC-1 and CC-1, UC-1 received approximately $45,000 in cryptocurrency and a bank wire for approximately $9,000 into accounts that UC-1 had provided to YOHANAN ELIGOOLA, the defendant, from an account held in the name of another individual. These transfers reflected that ELIGOOLA had taken a fee of approximately 10% of the $60,000 that ELIGOOLA laundered on UC-1's behalf.

### The Second Money-Laundering Transaction of $100,000

   10.   On or about April 27, 2023, a coconspirator not named herein ("CC-2") met with an additional FBI undercover agent ("UC-2") for a money exchange that had been arranged by UC-1 and YOHANAN ELIGOOLA, the defendant. The meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

   a.   UC-2 handed CC-2 approximately $100,000 in cash.

   11.   Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days later, UC-1 received approximately $50,000 in cryptocurrency and a bank wire for approximately $41,000 into accounts that UC-1 had provided to YOHANAN ELIGOOLA, the defendant. UC-1 therefore paid ELIGOOLA a fee of approximately 9% of the $100,000 that ELIGOOLA laundered on UC-1's behalf.

### The Third Money-Laundering Transaction of $116,000

   12.   On or about May 22, 2023, CC-1 met with UC-2 for a money exchange that had been arranged by UC-1 and YOHANAN ELIGOOLA, the defendant. The meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

   a.   Upon meeting CC-1 in UC-2's car, UC-2 apologized for being late, and explained that UC-2 "had to meet up with our other cartel guys here to get the money."

   b.   UC-2 handed CC-1 a white plastic bag containing approximately $116,000 in cash. While still in UC-2's car, CC-1 proceeded to count the $116,000 in cash.

13.     Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days later, UC-1 received approximately $60,000 in cryptocurrency and a bank wire for approximately $45,000 into accounts that UC-1 had provided to YOHANAN ELIGOOLA, the defendant. UC-1 therefore paid the defendant a fee of approximately 9% of the $116,000 that the defendant laundered on UC-1's behalf.

### The Fourth Money-Laundering Transaction of $120,000

14.     On or about May 31, 2023, YOHANAN ELIGOOLA, the defendant, messaged UC-1 an unsigned "Affiliate Marketing Agreement" between a company associated with YOHANAN ELIGOOLA (the "Eligoola Company") and a company associated with UC-1 ("UC-1 Company"). The agreement stated, in substance and in part, that the UC-1 Company would make sales on behalf of the Eligoola Company, and the Eligoola Company would then pay the UC-1 Company a commission. Based on my training and experience and my involvement in this investigation, I believe that the purpose of this agreement was to create a document that could be used as a cover for the money laundering payments.

15.     On or about June 14, 2023, YOHANAN ELIGOOLA, the defendant, and UC-1 met in person in New York, New York. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

   a.     UC-1 handed ELIGOOLA approximately $120,000 in cash.

   b.     ELIGOOLA and UC-1 discussed the potential sale of munitions. ELIGOOLA said that he could arrange for munitions to be transported to South America by plane.

   c.     ELIGOOLA said he would accept payment for munitions in cash or cryptocurrency, but refused to accept payment in cocaine.

   d.     ELIGOOLA told UC-1 that he was disappointed that UC-1 was transferring such small amounts of cash to him, and said that he had expected to be receiving $1 million per week from him.

16.     Based on my review of financial records and my discussions with other law enforcement officers, I know that several days later, UC-1 received approximately $100,000 in cryptocurrency and a bank wire for approximately $8,000 into accounts that UC-1 had designated to YOHANAN ELIGOOLA, the defendant. UC-1 therefore paid ELIGOOLA a fee of approximately 9% of the $120,000 that ELIGOOLA laundered on UC-1's behalf.

### The Fifth Money-Laundering Transaction of $150,000 and YOHANAN ELIGOOLA's Plan to Sell Surface-to-Air Missiles to the Undercover FBI Agents

17.     On or about July 20, 2023, YOHANAN ELIGOOLA, the defendant, and UC-1 met in person in Miami, Florida. That meeting was consensually recorded. Based on my review of

the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

      a.      ELIGOOLA implied that he was transferring the cash UC-1 provided him out of the United States via diplomatic pouch.

      b.      ELIGOOLA said that he made a profit of approximately 150 to 200% when he sold munitions.

      c.      ELIGOOLA said that some of the munitions he sold to other customers were marked up approximately 500% because they were "black market."

18.      On or about July 21, 2023, YOHANAN ELIGOOLA, the defendant, UC-1, and other undercover FBI agents met in person in Miami, Florida. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

      a.      UC-1 handed ELIGOOLA approximately $150,000 in cash.

      b.      The undercover agents said that they "have issues with aircraft," referred to "the fucking helicopters," and asked for "stingers." Referring to helicopters, YOHANAN ELIGOOLA asked, "why'd you take them down," and the undercover agents said, "you take one down, the others start scattering." Based on my training and experience and my involvement in this investigation, I know that the undercover agents, who represented that they worked for a South American drug cartel, meant that government helicopters had been interdicting the operations of the cartel. I further know based on my training and experience and my involvement in this investigation that the undercover agents requested Stinger missiles, which are a man-portable surface-to-air missile systems that are effective in shooting down helicopters, in order to shoot down government helicopters that were interfering with the drug cartel's operations.

      c.      ELIGOOLA showed UC-1 pictures of various military-grade munitions.

      d.      ELIGOOLA told the undercover agents to send him a list of the types of munitions they wanted to purchase.

      e.      ELIGOOLA told the undercover agents that they could visit him in other countries to see the munitions firsthand.

19.      Based on my review of financial records and my discussions with other law enforcement officers, I know that, several days after the July 21, 2023, meeting between YOHANAN ELIGOOLA, the defendant, UC-1, and other undercover FBI agents, UC-1 received approximately $90,000 in cryptocurrency and two bank wires totaling approximately $45,000 into accounts that UC-1 had designated to YOHANAN ELIGOOLA. UC-1 therefore paid ELIGOOLA a fee of approximately 9% of the $150,000 that ELIGOOLA laundered on UC-1's behalf.

20.      On or about July 28, 2023, UC-1 sent YOHANAN ELIGOOLA, the defendant, a message containing a list of munitions he wished to purchase, which included, "2 Stinger missiles." On or about August 7, 2023, ELIGOOLA messaged UC-1 a response in which he identified the

requested munitions he could provide, certain alternative munitions he could provide, the number of each type of munition he could provide, and the unit price of each type of munition. A copy of the list ELIGOOLA sent to UC-1 is below:

| N | DESCRIPTION | ALTERNATIVE | QUANTITY (PCS) | UNIT PRICE ($) |
|---|---|---|---|---|
| 1 | M4 Carabine (including 6 magazines, cleaning kits, red dot optics) | Supplied by DRD | | |
| 2 | Barrett .50 cal rifle with 4x32 optics and 5/10-rd magazine | M93 Black Arrow Long-range rifle | 10 | 25.500 |
| 3 | M67 fragmentation grenades | M75 fragmentation grenade | 100 | 100 |
| 4 | Claymore Mine | | 50 | TBC |
| 5 | RPG-7 Grenade Launcher | | 25 | 13.500 |
| 6 | 40 mm RPG-7 Rounds (Anti-Personnel) OG-7V | | 250 | 1.725 |
| 7 | 40 mm RPG-7 Rounds (Anti-Armor) PG-7V | | 250 | 2.025 |
| 8 | AT4 | | 25 | TBC |
| 9 | Carl Gustaf 8.4 cm recoilless rifle with 20 rounds per rifle | | 3 | TBC |
| 10 | Javelin missile | SABRE ER (Tube Missile, Command Launch System, Indor & Field Training Simulators, Test Equipment) | | 6,563,000 |
| 10 | Javelin missile | SABRE MR (Tube Missile, Command LaunchUnit, Indor & Field Training Simulators, Test Equipment) | | 6,190,000 |
| 11 | Stinger missile | FN-6 Manpad (5 Missile in Tube, 1 Firing Unit, 10 Ground Power & Gas Supply Unit, 1 Optical Sight) | 2 | 1,790,700 |
| 11 | Stinger missile | FN-16 Manpad (5 Missile in Tube, 1 Firing Unit, 10 Battery & Cooling Unit, 1 Optical Sight, 1 Thermal Sight) | 2 | 2,405,400 |
| 12 | Kamikaze drone | FH-901A Loitering Missile System (10 missiles, 1 Portable Ground Control Equipment) | 2 | 2,521,950 |
| 13 | XR-1 (24 units of UAV, 1 Mobile Guidance System, 1 Ground Station, 1 Launcher) | | 1 | 9,930,700 |
| 14 | 5.56 round | | 5.000 | TBC |
| 15 | .50 cal round | | 2.000 | TBC |

21.     Based on my training and experience and communications with other law enforcement officers, I have learned the following about the munitions offered for sale by YOHANAN ELIGOOLA, the defendant:

  a.   As to row 1, the "M4 Carabine" is an assault rifle

  b.   As to row 2, the "Barrett .50 cal rifle" is a sniper rifle.

7

  c. As to row 3, the "M67" is a grenade.

  d. As to row 4, the "Claymore Mine" is an anti-personnel land mine.

  e. As to row 5, the "RPG-7" is an acronym for "rocket-propelled grenade."

  f. As to row 6, "40 mm RPG-7 Rounds (Anti-Personnel)" are a type of ammunition for the RPG-7, designed for use against individual targets.

  g. As to row 7, "40 mm RPG-7 Rounds (Anti-Armor)" are a type of ammunition for the RPG-7 designed for use against armored targets.

  h. As to row 8, the "AT4" is a shoulder-fired anti-tank weapon.

  i. As to row 9, the "Carl Gustaf 8.4 cm recoilless rifle" is a shoulder-fired anti-tank weapon.

  j. As to row 10, the "SABRE ER" and "SABRE MR" javelin missiles are each anti-tank missiles.

  k. As to row 11, the "FN-6" and "FN-16" stinger missiles are man-portable surface-to-air missile systems. In particular, each of these weapons are "an explosive or incendiary rocket or missile that is guided by any system designed to enable the rocket or missile to seek or proceed toward energy radiated or reflected from an aircraft or toward an image locating an aircraft or otherwise direct or guide the rocket or missile to an aircraft, or a device designed or intended to launch or guide such a rocket or missile.

  l. As to row 12, the "FH-901A" is a drone aircraft designed to fly into a target and detonate.

  m. As to row 13, the "XR-1" is an unmanned aerial vehicle (UAV) system.

  n. As to row 14, "5.56 round[s]" refers to a type of ammunition frequently used for assault rifles.

  o. As to row 15, ".50 cal round[s]" are a type of rifle ammunition frequently used for sniper rifles.

### The Final Undercover Meeting and the Defendant's Arrest

22. On or about April 15, 2024, YOHANAN ELIGOOLA, the defendant, UC-1, and other undercover FBI agents met in person at a restaurant in New York, New York. That meeting was consensually recorded. Based on my review of the recording and my discussions with other law enforcement officers, I know that the following, in substance and in part, took place at the meeting:

   a. The undercover agents told ELIGOOLA that they wanted "Javelins" and "Stingers"—which I know, based on my training and experience, are anti-aircraft missiles.

   b. After ELIGOOLA called another individual, ELIGOOLA told the undercover agents, in substance and in part, that he had eight missiles. ELIGOOLA further stated, in substance and in part, that he could not be exact about timing, because "paperwork" would require time. ELIGOOLA also, in substance and in part, invited the undercover agents, or someone they trusted, to view the "merchandise" (which I understand, based on the context of the call, to be a reference to the missiles) in a foreign country.

   c. As a downpayment, the undercover agents provided ELIGOOLA with $690,000 in cash, as depicted below:



   d. After ELIGOOLA accepted the bag of cash and the meeting concluded, FBI agents arrested ELIGOOLA.

  23. After YOHANAN ELIGOOLA, the defendant, was arrested, law enforcement conducted a search of his cellphone pursuant to a judicially authorized warrant. Based on my review of that cellphone, I have learned the following regarding ELIGOOLA's communications with a coconspirator ("CC-3") regarding the sale of surface-to-air missiles:

9

   a. In or about September 2023, ELIGOOLA messaged CC-3 a version of the spreadsheet he had sent UC-1 on or about August 7, 2023, and ELIGOOLA and CC-3 had the following exchange:

| Sender | Message |
| --- | --- |
| ELIGOOLA | [sends spreadsheet that includes original request for Stinger missiles and alternative offer of FN-6 and FN-16 surface-to-air missiles] |
| ELIGOOLA | We need to finalize |
| ELIGOOLA | My rifles cost please put 2100$ |
| CC-3 | What do you mean |
| CC-3 | This list is for? |
| ELIGOOLA | [voice note] Part of the list, which one we sent about one months and a half ago, to one of my customers, I told you. Look, they just want to start with these products and continue with the big one. |
| CC-3 | Yes but they must show you the money without that it's water if the time |
| ELIGOOLA | [voice note] If you agree with all the details they send us, this is what they send us today. I want to know if it is OK so I can start, not to show the money, to ask them to put the money |
| CC-3 | <ul><li>Proof of funds</li><li>When we are sure that there is amount then we start the procedure</li><li>I already sold that items to Africans it's done</li><li>When the funds will be confirmed then I'll start the new procedures for getting the items</li></ul> |
| ELIGOOLA | But I can tell that we can supply |
| CC-3 | Yes but let's not waste our time |
| CC-3 | Seirously – if they need to get the info from us they can use the Wikipedia or yellow pages |

   b. Call records show that ELIGOOLA repeatedly attempted to call CC-3 during the April 15, 2024 with the undercover agents.

10

WHEREFORE, I respectfully request that a warrant be issued for the arrest of YOHANAN ELIGOOLA, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

LARISSA MONTES
Special Agent
Federal Bureau of Investigation

Sworn to before me, this 16th day of April, 2024.

THE HON. KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York